## Josef Lurie et al. v. Adolph J. Sabath et al.

|108    397|
|a208s  401|

1. APPELLATE COURT PRACTICE—*Where the Chancellor's Finding Will Not Be Reversed.*—Where the chancellor has seen and heard the witnesses testify, this court will not reverse except where it clearly appears that the evidence does not preponderate in favor of the decree.

2. TRUSTS—*Evidence Necessary to Create by Parol.*—To establish a trust upon parol evidence, the evidence must be very clear and satisfactory, and it ought to find support in the subsequent conduct of the parties.

3. SAME—*Upon Personal Property—By Parol—Evidence Must Be Clear.*—If it is intended to fasten a trust upon personal property, created verbally, and dependent upon merely oral testimony, the testimony ought to be clear and explicit.

Bill for an Accounting.—Appeal from the Circuit Court of Cook County; the Hon. MURRAY F. TULEY, Judge presiding. Heard in this court at the October term, 1902. Affirmed. Opinion filed June 18, 1903.

June 14, 1900, Joseph Lurie filed his bill of complaint in the Circuit Court against appellees, and including Max Lurie among the defendants. Max Lurie answered, admitting the allegations of the bill to be true, and disclaiming any interest in the property in question. The other defendants demurred to the bill, which demurrer was sustained.

Thereafter, March 9, 1901, an amended bill was filed, in which Max Lurie joined Josef Lurie as co-complainant. This bill sets forth that April 25, 1892, Josef Lurie was appointed guardian of the estate of the defendants, Albert, Bertha and Gottlieb Lurie, by the Probate Court of Cook County; that he qualified as such and so acted until November 23, 1898, when he presented his petition, resignation and report to said Probate Court, in which he charges himself as guardian with $26,697.21; credits himself with $2,589.85, and admits a balance of $24,107.36 due the estate of the three minors; that he owns two stocks of drygoods, worth about $16,000, and has a half interest in the goods in another store, which half interest is worth about $10,000; that November 21, 1898, the J. V. Farwell Co. unlawfully and without cause levied writs of attachment upon this

merchandise in a certain suit in assumpsit for an alleged indebtedness of $21,000; that he held two certain notes belonging to the estate aggregating $6,500, which he had hypothecated, but the parties at the time they took them knew they belonged to the estate; that he had title to two lots, subject to an incumbrance of $400; and that he had no other property whatever. He tenders all his interest in said property to his successor in office as guardian, and prays the court to ascertain the present value of said property and to credit him with such value. He tenders his resignation and asks that his successor be at once appointed.

That upon the filing of these papers the Probate Court entered an order accepting such offer to surrender to the court and to Joseph Sabath, as successor in office as guardian, all of his interest in said property as payment to the extent of the present money value thereof, to be thereafter determined by the court; and ordered Josef Lurie to convey such property and to deliver possession thereof to said Joseph Sabath, and for Sabath to accept the same as such guardian. (Here follows a description of the property.) Sabath is directed to take and hold said property, " or so much thereof as it is possible for him to take possession of as such guardian," and to inventory and to sell the same.

That November 23, 1898, letters of guardianship were issued to said Joseph Sabath. That Josef Lurie then was conducting and for many years past had conducted a retail business at two of the places named, and that his interest in said merchandise and the good-will thereof were worth $40,000. That Max Lurie and Josef Lurie owned the other stock of goods mentioned, and which, with its good-will, was worth $25,000. That November 28, 1898, Josef Lurie made and delivered a bill of sale of all his interest in said merchandise to said Joseph Sabath, together with a quit-claim deed of said two lots, and turned over to said successor certain notes and accounts, all of which said Sabath received as such guardian.

The bill sets up the two suits by the J. V. Farwell Company, the attachments thereunder, and states that said mer-

chandise was in the possession of the sheriff, under such writs, on November 23, 1898, and until December 28, 1898. That thereafter Joseph Sabath, Adolph J. Sabath, Sigmund Alexander and orator Josef Lurie with Max Lurie conferred together as to how best to realize upon said property for the benefit of said estate. Max Lurie then owned one-half interest in the third store, but all of the goods were in the hands of the sheriff under said attachment, and other attachments were anticipated. To protect said estate and the bondsmen of Josef Lurie as guardian for the balance that might be found due from him to the estate, he, said Josef Lurie, November 23, 1898, gave his promissory note to said Joseph Sabath, as guardian, for the sum of $24,107.36, payable one day after date, and said Sabath, on the 28th day of November, 1898, commenced a suit thereon in the Superior Court, and judgment was thereafter entered therein against orator Joseph Lurie.

That thereafter it was agreed between said Joseph Sabath, Adolph J. Sabath (who was one of the bondsmen of Josef Lurie), Sigmund Alexander and orator Josef Lurie, that Adolph J. Sabath and said Alexander should endeavor to settle all claims and to secure the possession of said property for the benefit of said estate, your orator, Josef Lurie, and his bondsmen; to which agreement, solely for such purpose, said Max Lurie consented; and that the equity of said Max Lurie in said goods was in excess of $6,000 in value. That said Adolph J. Sabath and Alexander were to provide the money and to purchase said claims for as low a price as possible, and to enter judgments thereon; that they were to buy such goods at the execution sales, sell such goods, and after repaying themselves, were to pay to the estate the amount due it from orator Josef Lurie, and to pay the balance thereof to orator Josef Lurie, accounting to orator Max Lurie for the property he has so transferred. That pending such agreement the sheriff, by consent, sold a part of said goods at retail for $8,000.

That the agreement between Adolph J. Sabath and Alexander was reduced to writing, in which, after reciting that

they had purchased at sheriff's sale on December 28, 1898, all of said goods for $14,000, and the sheriff had made and delivered to them a bill of sale and the possession of said goods, they agreed, as trustees, that they had purchased said goods in trust for the use and benefit of said Joseph Sabath as guardian, and themselves, under the following conditions:

They would sell said goods at retail for cash, buying not more than twenty-five per cent of net sales of new goods, and would continue such sales until they and the guardian should agree to sell the remainder at public sale or for cash; that they would furnish the money and buy up outstanding claims against Josef Lurie and Max Lurie & Co., so as to prevent bankruptcy proceedings and the levying of further writs on the goods. Out of the net proceeds of all sales there should be paid first to the trustees the sum of $10,500, which they had advanced in the purchase of the Farwell Company judgments; then the judgment of the Merrick Thread Co. for $340 should be paid; and they should retain $320 which they advanced for the Loeb claim, and any other sums they had paid out to protect such goods; the balance of the money and all goods remaining should be turned over to said guardian for the use and benefit of such minors. Orators say that they believe such an agreement was made, and they pray full discovery may be had concerning it.

That in this agreement the rights of orators to have any balance after the claims of the estate were extinguished, were disregarded; that such rights were not waived, and only a part of the understood agreement was reduced to writing.

That before this agreement was drawn Adolph J. Sabath and Alexander had purchased the claims in suit, and orators had consented to the entry of judgments in each of said actions. (The several judgments so entered are here set forth in detail.)

That pursuant to said agreement executions were issued on such judgments and the sheriff sold said goods remain-

ing after the sale at retail to said Adolph J. Sabath for the sum of $14,000; and relying upon said agreement orators did not seek other bidders. Orators charge that said Adolph J. Sabath and Alexander told bidders at such sale that they were bidding for the estate, and that no other bids would be received; and therefore certain bidders refrained from bidding, and certain bids for the goods for specific lots, in the whole exceeding $14,000, were rejected.

That the court, by consent of all parties, made distribution; that out of the net sum realized from the private and public sales there was paid to Adolph J. Sabath $13,581.59; to Adolph Levin & Co. $500.25; to Joseph Sabath, as guardian, $4,537.22; to M. T. Silver & Co. $114.44, and to Eisinger & Co. $17.95, the court retaining $1,000 awaiting the final determination of two pending suits. This order was entered that the trust agreement might be consummated. That said A. J. Sabath and Alexander paid for said claims a sum not exceeding $11,160; the amount paid under said order to A. J. Sabath in excess of the amount received by them did not exceed $418.41, which sum, together with the amounts realized by the sheriff from the retail sales, less the sheriff's charges, represents the amounts payable upon claims not assigned to them; this was the basis of their bid of $14,000 for the goods.

That the total amount paid out by A. J. Sabath and Alexander, after crediting the cash received from the retail sales did not exceed $12,000; that the goods they obtained under the sheriff's sale were worth $30,000 in cash, and the difference should have been applied to extinguish the liability of said Josef Lurie as guardian of said minors, and the balance, if any, should have been held for the benefit of said Josef Lurie, which balance (disregarding the good will of the business, which was worth $10,000) should have been $2,000.

That relying on the promises of Sabath and Alexander, orator Josef Lurie did not get their signatures to any written agreement before the sale; and after the sale they refused to sign the written agreement, but continued for

more than a year thereafter to deceive him by saying that they had purchased the property for the benefit of the estate, and would duly account therefor.

That A. J. Sabath, to defraud said Josef Lurie and his said bondsmen, transferred said goods and good will to the Albert Lurie Co., a corporation, in which Albert Lurie, one of the heirs, is interested with said J. A. Sabath and Alexander, intending thereby to prevent any attack upon them for their acts in the premises.

That in the first year the profits of A. J. Sabath and Alexander exceeded $10,000, and they had repaid themselves all their outlays and had $30,000 in value of the property remaining, which should have gone to the estate.

That the cash value of such property should have been credited to Josef Lurie as guardian, by said Joseph Sabath, guardian, subject to such liens, at the sum by which they were discharged, *i. e.*, $12,000; the goods received were worth $40,000, and Josef Lurie as such guardian was entitled to a credit of $24,107.36, and to an individual account as to the balance. Yet A. J. Sabath, Alexander and Joseph Sabath, conspiring, etc., now pretend that the sheriff's sale was *bona fide*, that A. J. Sabath bought said goods for his own benefit, and Joseph Sabath is seeking to credit orator Josef Lurie in the Probate Court only with said sum of $4,537.22 received by him under said order of distribution. That said Joseph Sabath denies the existence of any agreement, and denies that as such guardian he has any claim against A. J. Sabath and Alexander arising out of said sale; that he has failed to get any authority from the Probate Court approving said agreement, or to enforce the same; and has refused to enforce, for the benefit of said estate, the interest of said Josef Lurie in said goods.

That the Probate Court has no jurisdiction in the premises; and that these matters can be heard and determined in a court of chancery only. The prayer for relief, much in detail, conforms to the allegations of the bill.

Demurrers, both general and special, were filed to this bill. Upon which complainants amended the prayer for

relief by inserting a prayer enjoining Joseph Sabath as such guardian from seeking to obtain from the Probate Court any accounting against Josef Lurie without crediting him with such property; and from obtaining any adjudication against Josef Lurie, in which the said sum of $4,537.22 only, shall be placed to his credit.

Separate answers are filed to this bill by Bertha Lurie, one of said heirs, by John F. Holland, solicitor; by Joseph Sabath personally and as guardian of said minors, by Charles A. Churan, solicitor; by Albert Lurie, another of said heirs, by Charles A. Churan, solicitor; by A. J. Sabath and Sigmund Alexander, by Walker & Payne, solicitors; by Gottlieb Lurie, a minor, by Wm. O. LaMonte, guardian *ad litem;* and by the Albert Lurie Company, by Walker & Payne, solicitors. These answers cover seventy-nine printed pages of the abstract, and are too long to be here recited. Suffice it to say that in detail they deny each and every incriminating charge in the bill of complaint; and set up, among other defenses, that orators, having no business experience and no money, invested the said minors' estate in the several stores mentioned; that the business was a losing one from the start; that in November, 1898, the crisis came, and they tried to sell out everything for $18,000, but could find no purchaser; that the Farwell attachments were levied upon all the goods, and the sheriff was in possession when Josef Lurie filed his said petition, report and resignation in the Probate Court, at which time Josef Lurie owed the estate over $24,000 and did not have in his possession or control a dollar's worth of property except the little real estate described and a horse and wagon; that the said order entered by the Probate Court was drawn by Mr. Cox, then and now the solicitor for said Josef Lurie; that the sheriff remained in possession of the property and it never came into the possession of Joseph Sabath as successor to Josef Lurie as guardian; that if Josef Lurie ever made a bill of sale to Joseph Sabath, guardian, he never turned anything over to said Joseph Sabath except said horse and wagon and the two lots, worth about $750; that orators admitted

the Farwell Company claims to the amount of $22,000 were correct, and admitted that they owed the other claims severally set out in the order of distribution by the Superior Court, and the claims for rent; that the indebtedness of Josef Lurie amounted in all to more than $50,000; that the indebtedness of Max Lurie & Co. amounted to more than $13,000; that the funds put into this company belonged to the estate, and Max Lurie had no substantial interest in said business; that no agreement whatever was ever entered into between Joseph Sabath, A. J. Sabath and Alexander with said Max Lurie or Josef Lurie; nor was there any agreement in writing or any discussion about putting any agreement in writing; such an agreement as is set forth in the bill was never heard of by any of the defendants until late in January, 1899, after said Cox had a controversy with said Joseph Sabath; that the defendants purchased the Farwell Company claims for themselves with their own money, and no claim was made by any one that such purchases were made under any trust; and that said judgments were entered as a matter of course since the defendants therein had no defense and made no defense thereto; that defendants made no agreement or agreements as to bidding at such sale, but on the contrary such goods were sold to the highest bidder at public sale; nor did they or any one for them inform any prospective bidder that they were buying for the benefit of said estate, and that no bids would be received other than the bid of said Sabath; on the contrary many bids were made and received at such sale, and the property was purchased by said defendant Sabath, because he was the highest bidder; that there was never any arrangement by which $14,000 was bid at such sale; that the sums realized at such sale were the full value of said goods; that this insolvent business had no good will, nor did Joseph Lurie have or claim to have any equity in said property; that when Josef Lurie induced the Probate Court to enter the order, based upon his petition, both he and his attorney, Mr. Cox, knew that no property could properly pass under it to said Sabath as guardian; that afterward, and on June

Lurie v. Sabath.

5, 1900, said Josef Lurie, in said Probate Court, turned over to said Joseph Sabath, guardian, all his right, title and interest in and to said property; that said Probate Court has heard the matter of said petition and has decided that said sale was fair and *bona fide*, and that the interest of said estate in said goods amounted to $4,537.22, the amount received by said Sabath as guardian, and that said Josef Lurie is not entitled to be credited with any other sum; and has refrained from entering a final order thereon at the request of the chancellor before whom this case is pending; that the Albert Lurie Company was formed, and Albert Lurie having come of age, purchased twelve shares of stock in and is employed by said company; that the Probate Court has ample jurisdiction in the premises; that Max Lurie, in his answer to the original bill, in which he was a defendant, disclaims any interest in said "stock of goods or the proceeds thereof;" and that said bill is filed in the interest of William Kaspar, one of the bondsmen of said Josef Lurie, guardian, and that said Josef Lurie has no interest in the subject-matter of this suit, and no right to maintain this bill. The issues were made up, and over 1,200 pages of evidence were offered for and against the bill. After a full hearing in open court, including arguments by counsel, the learned chancellor dismissed the bill for want of equity. From which order and decree this appeal was perfected.

KRAUS, ALSCHULER & HOLDEN, attorneys for appellants.

JOHN F. HOLLAND, attorney for appellees.

MR. PRESIDING JUSTICE BALL delivered the opinion of the court.

The alleged fundamental error here urged as ground for reversal, and the only one that need be considered by us, is that the decree of the Circuit Court is against the weight of the evidence.

The question to be considered may be further limited. To sustain this bill the complainants must show a trust

agreement by which it is provided that after A. J. Sabath and Alexander have been reimbursed for their outlays and have been paid for their services, and the indebtedness of Josef Lurie, as guardian of the estate of these minors, has been liquidated, they, the complainants, were to receive the remainder of the fund arising from the sale of these goods. If they have failed to establish this condition, their suit must fail, even though they have proven a trust in other particulars; for without proof of this condition, they have no interest in the subject-matter of this suit.

The cause was heard in open court.

" The chancellor saw and heard the witnesses testify, and he was in a better position than we to judge of the truth of their statements and the weight that should be given to their testimony, and we will not reverse in such a case except where it clearly appears that the evidence does not preponderate in favor of the decree." VanVleet v. DeWitt, 200 Ill. 153, 156.

Among the matters that are not here in dispute are the following : Commencing in 1892, Josef Lurie, the then guardian of the estate of these minors, began to invest the moneys of this estate in merchandise, placed in the three stores described in the bill of complaint, in his own name or in the name of Max Lurie & Co., said Max Lurie being the son of Josef Lurie. That in November, 1898, Josef Lurie owed the estate at least $24,107.36. These stores had not been a financial success. It is evident that complainants were then wholly insolvent. Prior to the last date, the J. V. Farwell Company had levied attachments, issued November 21, 1898, in two suits against the Luries pending in the Superior Court, on all these goods for an admitted indebtedness of over $22,000, and other creditors of the complainants had begun suits, or were threatening to bring suits against them. The sheriff, under and by virtue of such attachment writs, was in possession of all these goods (except a horse and wagon), and so remained in possession until he sold the same, either at retail or at auction under writs of execution issued upon judgments theretofore obtained against one or both of the complain-

ants.   It also appears that on November 23, 1898, Josef Lurie had no money or property with which to make good his indebtedness to the estate, other than his equity, if any, in these attached goods and two city lots worth not to exceed $750.

Under these circumstances Josef Lurie, November 23, 1898, went before the Probate Court of Cook County, wherein such estate was being administered, and presented to it his petition, report and resignation.   Therein he admitted that as such guardian he was indebted to said estate in the sum of $24,107.36; that he had no property except his interest in these goods, two notes for 36,500, which he had hypothecated, and two city lots incumbered for $400.   He tendered his interest in said property, " or so much thereof as he is in possession of," to the court, and to his successor as guardian, and asked the court to ascertain the present value of his interest in said property, to credit him with such value, to accept his resignation, and to appoint his successor.   The court accepted his resignation, and appointed Joseph Sabath his successor as guardian, directed Josef Lurie to convey his interest in said property to his successor, and held the question as to the money value of such interest to be thereafter determined by the court.   The order further directed the new guardian " to take and hold said property, or so much thereof as it is possible for him to take possession of as such guardian, until the further order of this court."   Thereafter, and in the same month, Josef Lurie conveyed all his interest in all the property described in the petition to Joseph Sabath as guardian.   In this bill of sale Josef Lurie vouches that he is the true and lawful owner of said goods, chattels and property, and has in himself full power, right and lawful authority to dispose of the same.   It is admitted that no part of the goods thus tendered was ever put in the possession of the new guardian, nor was it then or ever after in the power of said Josef Lurie to deliver the possession thereof to any one.

A. J. Sabath, Joseph Sabath and Max Lurie and Henry

Lurie, with their solicitors, attempted to come to some agreement with the Farwell Company. The proposition was that all these goods should be conveyed to E. R. Webber, agent of the Farwell Company, to be by him reduced to cash, and the net proceeds paid, one-half to Joseph Sabath as guardian, and the other half to the Farwell Company upon their claims. At this time the Farwell Company claims stood upon the attachments levied prior to November 23, 1898. In their endeavor to come to this agreement the parties were confronted by certain hostile legal propositions and legal situations, such as the method of taking title, and the liability of the Luries to be adjudged bankrupts. For these reasons the Farwell Company, December 7, 1898, wholly abandoned the proposition and refused to further treat with the Sabaths and the Luries. The evidence does not show that during the discussion with the Farwell Company anything was said concerning the turning over of all interest which Josef Lurie had in these goods to his successor as guardian, or that any one interested in the Farwell Company was told that this had been done. Mr. Cox says that the trust agreement was not entered into while they were negotiating with the Farwell Company.

December 10, 1898, by consent of the parties, the sheriff began to sell the goods, still situate in the stores, at retail. In so doing he employed the Luries, Joseph Sabath and Sigmund Kaufman to run the business. From this sale about $8,000 was realized before the sheriff sold the remaining goods at auction. Kaufman was in the general employ of Alexander, and while engaged in these stores he made an inventory of the goods.

In order that the estate might prorate with the Farwell Company, Josef Lurie, under date of November 23, 1898, made and delivered to Joseph Sabath as guardian, his promissory note, due in one day from date, for the sum of $24,107.36. Suit was begun in the Superior Court of Cook County on this note December 1, 1898. On the same date five other suits were also begun in said court against Josef

Lurie, or Josef and Max Lurie.  Judgments were severally entered on each and all of said suits at the December, 1898, term of said court.  The amount of these judgments, exclusive of costs, was $48,531.79.

December 9,.1898, A. J. Sabath, for himself and Alexander, as he says, with their own moneys, bought the Farwell judgments for $10,500 or $10,750, and at or about the same date A. J. Sabath and Alexander purchased other claims against the Luries.  The sale of the remainder of these goods was made by the sheriff at auction December 29, 1898.  At that sale, after some contest between opposing bidders, A. J. Sabath became the purchaser of these goods at the cost of $14,000.  This purchase, he says, was for himself and Alexander, solely upon their personal account. After the sale the sheriff turned over the possession of the goods to A. J. Sabath and Alexander, and they continued to sell such goods at retail, at the stores before mentioned, as their own property.

December 29, 1898, said Superior Court entered an order in which it was found that the net results of the sales of said goods amounted to the sum of $18,751.45; and thereupon the court entered an order of distribution, directing the payment of $13,581.59, to A. J. Sabath as assignee of the two Farwell judgments and of the Merrick Thread Company judgment; to Adolph Levin & Co. $500.25; to Joseph Sabath as guardian $4,537.22; to M. T. Silver & Co. $114.44; and to Eisenger, Kramer & Co. $17.85; the court retaining in its control the sum of $1,000 to await the outcome of two suits then pending against said Josef Lurie.

April 26, 1900, Josef Lurie presented a petition to the Probate Court in the matter of the minors' estate, in which he states that November 23, 1898, he filed a full report as guardian, in which he tendered all his property to be applied on the payment of what might be due said minors; and that November 25, 1898, he turned over to Joseph Sabath, his successor, all of his property; since when he has done nothing in behalf of said estate; and he makes the report filed November 23, 1898, his final report and

account, and states that the deficiency was caused by the natural loss and decline of the mercantile business, and not through any wrongful act upon his part.

Josef Lurie, June 5, 1900, filed another petition in the same estate, in said Probate Court, in which he says that the property he turned over to his successor largely exceeded in value the amount of his liability to the minors; and he asks the court to determine the amount he is to be credited therefor, and that he be discharged, and that his bonds be canceled.

It will be noted that in neither of the petitions filed in 1900 is there anything said about a trust, nor of any liability of the defendants to the estate.

The bill sets up an express oral agreement, made November 23, 1898, by Josef Lurie and Max Lurie of the one part, and Joseph Sabath as guardian, the three minors, and A. J. Sabath and Alexander of the other part, by which the parties of the first part transferred their interest in these goods to the two Sabaths and Alexander; the latter, in consideration thereof, agreed to buy up all the outstanding claims with their own money, and to sell the goods, and, after reimbursing themselves, to turn over the balance to the estate to pay the indebtedness of Josef Lurie, and to account to complainants for any sum then remaining.

This agreement is set forth in writing in the bill, but it is admitted that it was not put in writing until more than forty days after it is alleged to have been made, when Mr. Cox wrote it out from memory, aided by a few notes put down upon a card. It also appears that neither A. J. Sabath nor Alexander ever signed the same, but always refused so to do.

It also seems clear that if any such agreement was made, it was made without the authority of Joseph Sabath, the guardian, who swears that he never heard of this trust agreement until in January, 1899, when, in the Probate Court, he tried to compel Mr. Cox to turn over to him as guardian a balance of $537 due him under the order of distribution in the Superior Court; and also without the

knowledge or the authorization of the Probate Court; and also without the actual knowledge or consent of any of the Lurie heirs.

It is further apparent that this agreement was not entered into November 23, 1898, as alleged in the bill. Mr. Cox fixes the date when the agreement was made as December 8, 1898. In rehearsing that interview, after he had given the substance of the agreement, he adds:

"Somebody said that—I don't remember who it was; I think it had also been talked of before—I am not sure of that, though."

He further says that the agreement was made between "A. J. Sabath and myself," as he said, speaking for Mr. Alexander and Joseph Sabath as guardian. He does not claim that everything in the agreement as set out in the bill was discussed and agreed upon between them. The compensation of the trustees was omitted.

"There are formal parts in there referring to litigation and other things that probably was not discussed, that would suggest themselves to a lawyer in dictating it."

When confronted with the legal proposition that Joseph Sabath as guardian could not create trustees to act for him, unless with the approval of the Probate Court, he admits the correctness of the proposition, and says:

"I never went to the Probate Court or consulted the judge of the Probate Court in regard to the trust agreement before drawing it up. I never had the chance to obtain the sanction of it."

Complainant Max Lurie, in speaking of the interview in which it is asserted that the trust agreement was entered into, says:

"I could not give any words, or any conversation that Adolph (A. J.) Sabath said at that meeting; I could not say what he said, even the substance of what he said; but I know he did not dissent from "—"I don't recollect any particular words that was said. The substance would be that he said he would carry out this agreement."

Henry Lurie says that Mr. Alexander told him that he, Alexander, would be willing to put up the money necessary

to buy up the Farwell attachments and open up the stores, provided A. J. Sabath would go with him as partner; that he thought that was the best way to get out of it to save the children's money. Julius Lurie testifies to the same effect.

Mr. Alexander explicitly denies that any such conversation took place, and says that he bought the stock for himself and not for the heirs; and that the first time he heard about the trust agreement was (in January, 1899,) when Mr. Cox called to see him.

Judge Payne testifies that he was present at the interview of December 8, 1898:

"At that conversation it was stated that Mr. Alexander had agreed to join with Justice Sabath in making the purchase of the Farwell claims, for himself, and Mr. Alexander. Question: "You may state what, if anything, was said at that meeting about Sabath and Alexander acting on behalf of the minors?" "Nothing of that sort was stated then, or at any time within my knowledge, that is, prior to the sale." "The first I heard anything on that subject was about the 9th of January." * * * "I never heard the figures $14,000 mentioned before the sale."

A. J. Sabath swears:

"I never did, on any occasion, to Cox or to any living person, say that I expected to buy these stores for $14,000, because I did not know myself for what sum."

He denies absolutely that at any of these interviews anything was said about buying these stores for the minors. He asserts that he never said that to any one; and that he never heard of the trust agreement until January 9, 1899.

"I bought this stock of goods for the purpose of trying to save myself the loss that at the time I understood we would have to stand, me being on the bond."

Joseph Sabath, the guardian, testifies that he never heard of the trust agreement until in January, 1899; and never talked with A. J. Sabath about taking an assignment from the Farwells for his benefit.

"At the time of the sale I did not know of any agreement with A. J. Sabath and Alexander that they were to buy

in these stocks for my benefit as guardian of the minors, and would not consent to it if they had made such a proposition." * * * " I never saw a copy of this trust agreement. Mr. Cox never told me the contents of it, or of any trust agreement. He never asked me to sign any such trust agreement. I never asked leave of the Probate Court to enter into any trust agreement."

We have set down the foregoing extracts from the evidence in order to show the indefinite character of the proof as to the terms of this alleged agreement, if any was ever made, and the startling contradictions of respectable, intelligent and unimpeached witnesses as to whether or not such an agreement was ever entered into.

Neither A. J. Sabath nor Alexander stood in any relation of confidence to these minors. They had a guardian and counsel to aid them and to protect their interests. The latter was present at all the important interviews, commencing with November 23, 1898. Unless this trust agreement is established, neither A. J. Sabath nor Alexander was obligated to act in the interest of the minors.

This express agreement, if made at all, was made on or after December 8, 1898. Up to that date the Farwell agreement was still under discussion, and until that agreement was abandoned there existed no reason for other action.

Why was this trust agreement not put in writing before the public sale? Twenty days elapsed after it is alleged to have been made before that sale took place. Josef Lurie was vitally interested in the payment of the $24,000 he owed the estate. If he could accomplish that he saved his good name, he exempted his sureties from financial hardship, and he kept himself outside of the prison door which opens to receive the body of a defaulting guardian. Yet he suffers this agreement, which promised to wipe out these dangers, to remain unwritten and unsigned at the time he lost all title to and equity in these goods.

The fact that the heirs and their estate were protected from ultimate loss by reason of the bonds given by Josef Lurie as guardian, which in the absence of evidence to the

contrary, must be presumed to be good, does not render the alleged trust agreement invalid; nor does the fact that the permission of the Probate Court, if that could be had, was not obtained, affect the legality of such agreement; but both of such facts are arguments to be considered in the decision of the question as to whether such an agreement was or was not entered into.

The fact that A. J. Sabath bought these goods is equally explained by the trust agreement, and by his position as bondsman. In either event he was lessening his ultimate liability. In the one event by a payment, in part at least, of the debt, and in the other by obtaining a profit by means of which to meet his obligations.

To establish a trust upon parol evidence, the evidence must be very clear and satisfactory, and it ought to find support in the subsequent conduct of the parties. Crissman v. Crissman, 23 Mich. 221.

If it is intended to fasten a trust on personal property, created verbally, and dependent upon merely oral testimony, the testimony ought to be clear and explicit. Bailey v. Irwin, 72 Ala. 507.

We have carefully gone over the evidence in this case, covering over 400 pages of the printed abstract. We are not warranted in setting forth that evidence in detail, but must content ourselves by saying that we find much contradictory evidence, much that is wholly irreconcilable. Respectable witnesses clash upon almost every point which tends to prove or to disprove the making of the alleged trust agreement. The subsequent conduct of the parties preponderates against the existence of such an agreement. Under these circumstances an appellate tribunal, not having seen or heard the witnesses, has no right to override the decision of the chancellor, who had those advantages.

But it is asserted that by reason of what was said in these interviews, and the acts of Sabath and Alexander, the Luries were misled into believing that the sheriff's sale was for the benefit of the minors, and for that reason bidders were deterred from bidding at the sale, and as a consequence the

.prices obtained were less than they otherwise would have been.

There is not enough evidence in this record to impeach the sheriff's sale, in view of the finding of the chancellor.

It seems to have been carried on as such sales usually are. There were many people present.   The deputy sheriff who conducted the sale says :

" The sale was to the highest bidder.   The bidding covered a range of several thousand dollars.   It began lower and went higher."

Anton Immekus, the buyer for L. Klein, testifies that he bid upon each of the two lots into which the goods were divided; that three or four men were bidding, and that soon after he bid $8,600 upon the Max Lurie & Co. stock, his bid was raised, and he would go no further " because we did not think the stock was worth more money."   Sol Klein, who had looked over these goods prior to the sale, said he was present at the sale; that the Pilsen goods started at $3,500; the bidding was rapid; his last bid was $4,500. " It reached my limit, what I wanted to pay for it, and the bidding went on."   This stock brought $5,300.   It is true that Edward Silha, a son of one of the bondsmen, swears that A. J. Sabath told him, the witness, that he should not bid on the stock; that he, Sabath, was bidding on it, and that he would buy it for the interest of the heirs and of the bondsmen; but A. J. Sabath explicitly denies that he ever made such statement.

From all the evidence we are of the opinion that the sale made was a fair and valid sale.

As to the adequacy of the prices realized at such sale, the evidence is as follows :

" Josef Lurie, in his petition filed in the Probate Court November 23, 1898, fixes the value of these goods at $36,000.   Max Lurie places their value at from $32,000 to $36,000, but he admits that the best offer he could get for them at private sale was about $18,000; ' from $16,000 to $19,000.' "

Julius Lurie says the stores were worth " about $40,000." These values are based upon the condition of this stock in

November, 1898. Samuel Hohn had a general impressi-in. that on the day of the public sale the goods were worth from $30,000 to $35,000.

S. Kaufman, who took an inventory of these goods after the retail sale, says the goods were worth $15,000 to $18,000.

Charles F. Harding, who represented the Farwell Company, referring to November, 1898, said in his opinion "they could not be reduced to cash at any sale at that time at to exceed $20,000." The nominal value was from $33,000 to $35,000. .

Sol Klein says $14,000 would be a good price to pay for these stocks at the time of the public sale. Four other experienced buyers testify substantially as does the witness Klein.

Including the sales at retail there was realized from this stock the sum of $22,834.68. From what we know of the prices obtained for stocks of merchandise at judicial sales, we are of the opinion that this result is adequate and satisfactory.

The whole case being considered, we are satisfied that in dismissing this bill the chancellor did not err, and we therefore affirm the decree of the Circuit Court.